## O'HALLORAN vs. THE STATE OF GEORGIA.

1. The name given to it, in the Bill of Indictment, does not characterize the offence; the disruption characterizes it.
2. It is neither legally or morally wrong for persons to combine to detect an offence.
3. The furnishing of liquor to slaves is a crime which, in its consequences, is one of the most mischievous in the Code.

Indictment for a Misdemeanor, in Meriwether Superior Court. Tried before Judge BULL, at the February Term, 1860.

At the August Term, 1859, of the Superior Court of Meriwether county, a bill of indictment was found against William O'Halloran, in which the grand jury, "In the name and behalf of the citizens of Georgia, charge and accuse William O'Halloran, of the county and State aforesaid, with the offence of a misdemeanor: For that the said William O'Halloran, in said county, on the twenty-sixth day of July, in the year one thousand eight hundred and fifty-nine, being then and there a shop-keeper, did furnish and sell to a negro man slave, named Sam, said slave then and there being the property of one Martin Gates, a certain quantity, to wit: one pint of brandy, whisky, and other spirituous liquors, for his, the said slave's, own use, without the knowledge or consent of the owner, overseer or employer, he, the said William O'Halloran, not then and there being the owner, overseer or employer of said slave, Sam, and not then and there having

---

**NAME GIVEN OFFENSE IN INDICTMENT.** "We conclude, therefore, that, as charging the offense of seduction, the indictment was bad. Its allegations were inadequate to that charge; but it contains all of the substantive facts constituting a case of adultery and fornication, alleged probably with too minute and unnecessary particularity, but nevertheless stated so that, if proven, a verdict for the latter offense would stand. The evidence is clear and satisfactory to each of the material averments constituting the offense of adultery and fornication. It has been often ruled in this court that an offense is characterized, not by its specific designation in the indictment, but by the criminal acts therein alleged to have been committed. See 3 Ga. 147 and 31 Ga. 206." Disharoon v. State, 95 Ga. 356.

said slave under his care, contrary to the laws of said State, the good order, peace and dignity thereof."

When the case came up for trial, and before the same was submitted to the jury, counsel for the defendant moved to quash the indictment on the ground, that the offence charged was not denominated a misdemeanor, and was not an indictment authorized by the statute.

The presiding Judge overruled the motion, and counsel for defendant excepted.

The evidence submitted to the jury on the trial of said case, showed: That O'Halloran was the keeper of a liquor shop, at the White Sulphur Springs, in Meriwether county, Georgia; that the prosecutor and the other witnesses, suspecting that something was wrong about the said shop, went, on the night of the 26th of July, 1859, for the purpose of detecting such wrong, if any; that the said witness took a position near the shop, so as to see everything that was going on in and about the shop; that there were three large lamps hanging in the passage or piazza of the shop, and some two or three inside, which made it light as day; that a negro man came to the shop and passed up and down the piazza several times, and then would go off in the direction of the hotel and then return to the shop; the negro did this five or six times, there being several persons passing in and out of the shop; that, after every one had left the shop but the defendant, the negro went into the house, and then came out of the door, when the defendant handed him a bottle, and the negro started off, and when about sixty or seventy yards off, one of the witnesses hailed and stopped the negro, took the bottle from him, and found it to contain whisky; in the early part of the same night, the negro had an empty bottle; that it was after ten o'clock at night when the defendant gave the negro the bottle; that Martin Gates has a stout, dark colored negro man, called Sam.

After the testimony and argument had closed, the Court charged the jury as follows:

The law does not require positive testimony in any case; that circumstantial evidence is sometimes as satisfactory as that of a positive character; all that the law requires is, that the jury shall be satisfied beyond a reasonable doubt. I will illustrate my idea: Suppose that your smoke-house is robbed, and a man is seen loitering about the smoke-house—

that would be a circumstance, though slight, indicating his guilt. But, if he is afterwards seen going off from the smoke-house with a ham of meat, that additional circumstance would increase the presumption that he stole your meat, and was guilty of that offence. There is nothing morally or legally wrong, if a man suspects that a crime is about to be committed, to lay a plot and conspire with others to detect the perpetrator. The fact that the prosecutor or witnesses watched and waylaid for the purpose of detecting a supposed crime, has nothing to do with the question of the guilt or innocence of the accused.

This charge, and the decision, refusing to quash the indictment, as before stated, constitute the errors complained of.

DOUGHERTY, represented by B. H. HILL, for the plaintiff in error.

COOPER, Solicitor-General, represented by L. J. GLENN, for the defendant in error.

*By the Court.*—LUMPKIN, J., delivering the opinion.

Counsel for the defendant moved to quash the indictment, because it did not call the offence a misdemeanor. Singularly enough, this objection is unfounded in point of fact, if the copy of the indictment in the transcript of the record be correct, as we doubt not it is.

But, whether this be so or not, this Court—in *Camp vs. the State* (3 *Kelly R.* 417)—held, that such omission was an immaterial defect; that it is the description that characterizes the offence, and not the name given to it in the bill. Counsel overlooked this decision, no doubt, so directly in point in this case. Perhaps the adjudications of this Court (not the *obita dicta* of individual members) will be more carefully studied when it is announced that, under its present organization, one of its own decisions is not only the highest, but the only authority that is needed upon any question, and that it is a useless consumption of time, either to go back of the decision to sustain it by reported cases, or to combat it, with a view to have it reconsidered and reversed. Like the laws of the Medes and Persians, what is written in the books of our Reports will remain written, unless re-

pealed, altered or modified by the Legislature. The titles to property—to say nothing of liberty and life—are too sacred to depend upon the fluctuating opinions of a Court, which are liable to be changed by the accession of any new member to the Bench.

As to the other point, which counsel, who argued the case, informed us he was told by his absent brother, was in the record, we, like him, have searched diligently, but are unable to find it.

The Court charged the jury that the guilt of the defendant might be made out by circumstantial as well as positive proof. All that the law required was, that they should be convinced, beyond a reasonable doubt, of the guilt of the accused. His Honor gave an illustration of circumstantial evidence, and finally instructed the jury that there was nothing, legally or morally, wrong for persons to lay a trap, or conspire with others, to detect a culprit; that that has nothing to do with the guilt or innocence of the accused— to all of which we heartily subscribe. The fact that a plan was laid to catch the offender, may warrant the jury in scrutinizing the testimony a little more carefully, we do not deny; and there was nothing in the charge to contravene this idea. Indeed, the guilt of the defendant is too manifest to talk about the proof.

And he has been convicted of an offence which is more destructive to our slave population; and, therefore, to the rights of property, than any in the Penal Code. It has been asserted, upon reliable statistics, that the number of negroes destroyed by liquor every year, in this State, will average one to each county; and generally they are the most valuable slaves—male and female—in the community. And the mischief, enormous as it is, stops not here. The lives and property of their owners are frequently jeoparded in this way. A bottle was found upon the person of the driver of the Winn family, who were so massacred and mangled upon the Macon & Western Railroad by attempting to cross ahead of the train, while running at full speed. I simply mention the fact, without intending to impute blame to the driver. But how often—at night especially—in our cities and towns, is the safety of families put in peril by drunken drivers? And even this is not all. Should the scenes of St. Domingo be ever re-enacted in our midst, it will be found that liquor

has much to do with it. It engenders recklessness, and nerves the arm of the timid and hesitating to deeds of desperate daring and death.

## JUDGMENT.

Whereupon, it is considered and adjudged by the Court, that the judgment of the Court below be affirmed.